STATE OF NORTH CAROLINA v. RAYFORD LEWIS BURKE

No. 181A93

(Filed 10 May 1996)

**1. Evidence and Witnesses § 876 (NCI4th)— capital murder— victim's fear of defendant—statements of defendant to others**

The trial court in a prosecution for first-degree murder did not err by overruling defendant's objections to testimony by a victim witness coordinator and an officer concerning statements made to them by the victim concerning threats made by defendant through the victim's uncle and an intimidating visit made by defendant's brothers to the victim's home. The trial court concluded after a *voir dire* that there was a factual basis for the alleged fear in that the victim was a material witness against defendant in another case involving a shooting death, evidence relating to the victim's mental or emotional state of mind concerning his feelings about defendant was admissible, and the probative value of that evidence outweighed any prejudicial aspects that the statements may have had in regard to defendant, then allowed the State to present the evidence subject to an instruction limiting the purposes for which the testimony could be used. The decision to admit the testimony of these two witnesses is in accord with the precedent of the North Carolina Supreme Court. Since the evidence was competent as a statement of the victim's existing state of mind, it does not matter that it may prove some fact that is irrelevant or for which the evidence is incompetent. In each instance, the court gave a limiting instruction to which defendant did not object. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Witnesses § 1026.**

**Uniform evidence Rule 803(24): the residual hearsay exception. 51 ALR4th 999.**

**2. Evidence and Witnesses § 875 (NCI4th)— capital murder— visit to victim's house by defendant's brothers—statements by defendant to others—not prejudicial**

There was no prejudicial error in a prosecution for first-degree murder in the admission of testimony from a victim assistance coordinator, and corroborating testimony from an officer,

that the victim had told her that defendant's brothers had visited the victim's house, that his girlfriend was there, and that he was afraid for his girlfriend and himself. Although the testimony was inadmissible because the brothers' state of mind was not relevant and could not be used to show defendant's state of mind, the trial court granted defendant's request for an instruction limiting the purposes for which the evidence could be used, the jury was aware that the victim had testified against defendant on a previous murder charge, and there had been testimony that defendant had gotten into an altercation about the victim's testimony in the prior trial when defendant entered the house.

**Am Jur 2d, Witnesses § 1026.**

**Uniform evidence Rule 803(24): the residual hearsay exception. 51 ALR4th 999.**

3. **Criminal Law § 480 (NCI4th)— capital murder—conversation overheard by juror—no error**

The trial court did not abuse its discretion in a first-degree murder prosecution by not conducting an inquiry into the precise content and possible impact of an incorrect and prejudicial statement made by outsiders which may have been heard by a juror during the guilt-innocence phase of the trial where the trial court announced that a juror had overheard in the canteen during recess unidentified people say that defendant had been involved in two other murders or two other murder cases. There is no contention that a spectator actually talked to the juror, only that the juror may have inadvertently overheard prejudicial conversation, defendant declined the judge's offer to make an inquiry of the juror in order to determine whether the juror had overheard the conversation, and the judge instituted special measures to insulate the jury from exposure to any casual conversations between spectators.

**Am Jur 2d, Trial §§ 1526, 1562, 1564, 1566.**

**Communication between court officials or attendants and jurors in criminal trial as ground for mistrial or reversal—post-*Parker* cases. 34 ALR4TH 890.**

**4. Evidence and Witnesses § 2898.5 (NCI4th)— capital murder—cross-examination of defendant—details of prior crimes**

There was no error in a first-degree murder prosecution where defendant contended that the court erred in overruling his objection to cross-examination of defendant about the details of two crimes for which defendant had prior convictions. The trial court did not overrule defendant's objection to his client's attempt to explain the circumstances surrounding the first assault, but simply responded, "He may explain his answer if he wishes to do that." Defendant may not obtain a new trial based on his own election to testify about these matters. As to the second assault, defendant failed to object to the cross-examination and, although he argues that an objection would have been futile in view of the trial court's overruling the prior objection, the trial court did not overrule that objection. The prosecutor asked, "Was that self-defense too?" and defendant responded, "I was into it with Mr. Anthony and several other people. Whatever you may want to call it." The trial court did not err in permitting defendant to respond to the prosecutor's question.

**Am Jur 2d, Trial §§ 501, 844, 924.**

**Adequacy of defense counsel's representation of criminal client regarding prior convictions. 14 ALR4th 227.**

**Requirement that defendant in state court testify in order to preserve alleged trial error in rulings on admissibility of prior conviction impeachment evidence under Uniform Rule of Evidence 609, or similar provision or holding—post-*Luce* cases. 80 ALR4th 1028.**

**5. Evidence and Witnesses § 263 (NCI4th)— capital murder—witness's request for relocation—not admitted to show defendant's violent character**

The trial court did not err in a first-degree murder prosecution by overruling defendant's objection to the State's question to its witness about the witness's request for relocation where the testimony was not admitted to show that defendant has such a violent character that he would kill anyone who testified against him, but to explain why the witness initially did not want to testify against defendant and why the witness could have made statements indicating that he could not remember what happened

during the shooting. Furthermore, the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 404.

**Am Jur 2d, Witnesses §§ 739, 935, 986, 991.**

**6. Evidence and Witnesses § 2090 (NCI4th)— capital murder—victim afraid—lay opinion testimony**

The trial court did not err in a prosecution for first-degree murder by admitting testimony from the director at a shelter where the victim had been staying that he had appeared tense or scared at times. Opinion testimony, including lay testimony, is admissible concerning the state of a person's appearance or emotions on a given occasion; here, the testimony described the victim's emotional state during his time in the shelter and was admissible as tending to shed light upon his state of mind at that time. The probative value of the evidence was not substantially outweighed by its unfair prejudice to defendant.

**Am Jur 2d, Wills § 159; Witnesses § 197.**

**Comment note.—Ability to see, hear, smell, or otherwise sense, as proper subject of opinion by lay witness. 10 ALR3d 258.**

**7. Evidence and Witnesses § 3091 (NCI4th)— capital murder—impeachment of defense witness—extrinsic evidence**

There was no prejudicial error in a first-degree murder prosecution in overruling defendant's objection to the State's introduction of extrinsic evidence to impeach the credibility of a defense witness on a collateral matter. Assuming error, there was not a reasonable possibility that a different result would have been reached had the error not been committed because the State thoroughly cross-examined the witness on this general topic. Also, although she was an important witness, she was not inside the house where the shooting occurred at the time of the shooting.

**Am Jur 2d, Witnesses §§ 814, 815, 865, 995.**

**Admissibility of affidavit to impeach witness. 14 ALR4th 828.**

8. **Evidence and Witnesses § 2470 (NCI4th)— capital murder—state witness not arrested—defendant not allowed to question law enforcement officials**

The trial court did not err in a first-degree murder prosecution by refusing to allow defendant to question prosecutors, members of the prosecutorial staff, and law enforcement officers about their decision not to seek to have a key prosecution witness arrested on outstanding warrants prior to his testimony. There was no evidence presented at the *voir dire* to show that the witness had received or been promised favors from the State, the evidence shows that the prosecutors refused to discuss the pending charges with the witness, defendant cross-examined the witness as to the nature of the charges pending against him and the reason he had not been arrested, the witness testified that no one had offered him any concessions, and defendant did not attempt to question law enforcement officers during their testimony about their failure to serve the outstanding warrants.

**Am Jur 2d, Witnesses §§ 717, 815.**

**Adverse presumption or inference based on state's failure to produce or examine law enforcement personnel— modern cases. 81 ALR4th 872.**

9. **Homicide § 485 (NCI4th)— capital murder—deliberation— intent to kill formed during quarrel—instruction not given**

There was no plain error in a first-degree murder prosecution where the trial court did not instruct the jury that a killing is not done with deliberation if a defendant forms the intent to kill during a quarrel or struggle where no evidence presented at trial showed that defendant formed the intent to kill during a quarrel or struggle.

**Am Jur 2d, Trial §§ 1078, 1124, 1176, 1186, 1483.**

**Accused's right, in homicide case, to have jury instructed as to both unintentional shooting and self-defense. 15 ALR4th 983.**

10. **Evidence and Witnesses § 1070 (NCI4th)— capital murder—flight as evidence of guilt**

The trial court did not err in a first-degree murder prosecution by instructing the jury that it could consider evidence that defendant had fled the scene of the shooting as evidence of his guilt.

STATE v. BURKE

[343 N.C. 129 (1996)]

Am Jur 2d, Trial §§ 1333, 1334.

Modern status of rule regarding necessity of instruction on circumstantial evidence in criminal trial—state cases. 36 ALR4th 1046.

11. Criminal Law § 1337 (NCI4th)— capital sentencing—aggravating circumstances—prior conviction involving violence—timing of conviction

The trial court did not err in a capital sentencing hearing in submitting the aggravating circumstance of prior conviction for a violent felony by instructing the jury to consider defendant's conviction for a felonious assault where the conviction occurred after the capital murder. It is not necessary that a defendant be convicted before the commission of a capital murder so long as defendant has been convicted of the violent felony prior to the capital trial.

Am Jur 2d, Trial § 1760.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.

12. Criminal Law § 1337 (NCI4th)— capital sentencing—prior conviction involving violence—sufficiency of evidence

There was sufficient evidence in a capital sentencing proceeding to support the jury's finding of the aggravating circumstance that defendant had previously been convicted of a crime involving the use or threat of violence, and the trial court did not err in instructing the jury to consider defendant's conviction for breaking or entering with respect to this circumstance, where the State presented evidence that defendant had pled guilty and was convicted of felonious breaking or entering with intent to commit a sexual assault against a four-year-old child; the child's mother testified that she briefly left her apartment with her two children inside; the four-year old was "screaming and hollering" at defendant when she returned; the child had been fully dressed when her mother left but was wearing only panties and a t-shirt when she returned; defendant was in the bathroom, washing his penis in front of the one-year old; defendant replied, "Ha," when the

STATE v. BURKE

[343 N.C. 129 (1996)]

mother confronted him; and defendant's hat was found on the four-year old's bed.

**Am Jur 2d, Trial § 1760.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

**Chronological or procedural sequence of former convictions as affecting enhancement of penalty under habitual offender statutes. 7 ALR5th 263.**

13. **Criminal Law §§ 1363, 468 (NCI4th)— first-degree murder—residual doubt—not allowed as closing argument—not submitted as mitigating circumstance**

The trial court did not err in a first-degree murder prosecution by granting the State's motion to prohibit defendant's closing argument about residual doubt and by denying defendant's request to submit residual doubt as a mitigating circumstance.

**Am Jur 2d, Trial § 645.**

**Adequacy of defense counsel's representation of criminal client regarding argument. 6 ALR4th 16.**

14. **Jury § 141 (NCI4th)— capital murder—jury selection—questions on parole eligibility**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to permit questioning of prospective jurors on parole eligibility.

**Am Jur 2d, Jury § 196.**

**Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.**

15. **Criminal Law § 1351 (NCI4th)— capital sentencing—mitigating circumstances—instructions—burden of persuasion**

The was no error in a capital sentencing proceeding in jury instructions that defined defendant's burden of persuasion to prove mitigating circumstances as evidence that "satisfies" each juror.

**Am Jur 2d, Trial § 1291.**

Homicide: modern status of rules as to burden and quantum of proof to show self-defense. 43 ALR3d 221.

**16. Criminal Law § 1323 (NCI4th)— capital sentencing—mitigating circumstances—instructions—value of circumstances**

The trial court in a capital sentencing hearing did not violate the Eighth and Fourteenth Amendments by allowing the jury to refuse to give effect to mitigating evidence if the jury deemed it not to have mitigating value or by allowing jurors not to give effect to mitigating circumstances found by the jurors.

Am Jur 2d, Trial § 1760.

**17. Constitutional Law § 314 (NCI4th)— capital sentencing—effective assistance of counsel—certain witnesses not presented—no psychiatric examination—counsel acceding to defendant's choice**

The trial court did not err in a capital sentencing hearing by permitting defense counsel to accede to defendant's choice to present defendant's penalty phase case without witnesses from defendant's family and without a psychiatric examination of defendant.

Am Jur 2d, New Trial § 197.

Ineffective assistance of counsel: compulsion, duress, necessity, or "hostage syndrome" defense. 8 ALR5th 713.

**18. Criminal Law § 1373 (NCI4th)— capital murder—death sentence not disproportionate**

A sentence of death for first-degree murder was not disproportionate where the record fully supports the two aggravating circumstances found by the jury, there is no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration, this case is not substantially similar to any case in which the Court has found the death penalty disproportionate, and the case is similar to certain cases in which the death penalty was found proportionate. There are four statutory aggravating circumstances which have been held sufficient, standing alone, to sustain death sentences and the circumstance found here, a previous conviction of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), is among them. Furthermore, the evidence of defendant's guilt was clear; he shot the victim in cold blood

before three eyewitnesses because the victim had testified against him in a previous murder trial. N.C.G.S. § 15A-2000(e)(8).

**Am Jur 2d, Trial §§ 841, 1760.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Cornelius, J., at the 15 March 1993 Criminal Session of Superior Court, Iredell County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 11 September 1995.

*Michael F. Easley, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

In a capital trial, defendant, Rayford Lewis Burke, was convicted by a jury of first-degree murder. In a capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court imposed a sentence of death. For the reasons discussed herein, we conclude that defendant's trial and capital sentencing proceeding were free of prejudicial error and that the death sentence is not disproportionate. Accordingly, we uphold defendant's conviction of first-degree murder and sentence of death.

The State's evidence presented at trial tended to show the following facts and circumstances: On 23 January 1992, Jesse Wilson was at his home in his kitchen with Freddie Teasley, Timothy Morrison (the victim), and Jimmy Knox. In the early afternoon, Wilson had consumed a pint of Wild Irish Rose wine, but no controlled substances. Morrison gave Teasley some money, and Teasley went to the liquor store and purchased a bottle of gin. When Teasley returned shortly thereafter with the bottle of gin, defendant and Robert Lee Griffin arrived at Wilson's house. Morrison, Knox, and Teasley were sitting at the table in the kitchen. Wilson went to the

door and allowed defendant and Griffin to enter the house. Wilson had known defendant for several years, and defendant had been to Wilson's house on prior occasions. Neither defendant nor Griffin announced the purpose of their visit.

After defendant entered the house, he proceeded to the kitchen, and when he asked for a drink of the gin, Morrison invited him to "go ahead and get you a drink." According to Wilson, defendant drank "about half" of the bottle of gin. Defendant then told Morrison that he wanted to talk to him; and, at Wilson's suggestion, defendant and Morrison stepped into an adjoining bedroom. After defendant and Morrison left the kitchen area, Wilson "heard a ruckus," which he described as "some bumping around." Wilson hollered that he "wasn't going to have it in [his] house." When defendant and Morrison came out of the bedroom, defendant said, "I am going to tell all you son-of-a-bitches something." Defendant pointed at Morrison and said, "That man testified against me. He know [sic] I didn't kill that man at the Busy Bee." Defendant then left the house for "a minute or so." Morrison sat down at the kitchen table and said, "[E]verything is all right." Wilson asked Griffin to talk to defendant, and Griffin then exited the house through the front door.

Shortly thereafter, defendant reentered the house and walked "straight through" to where Morrison was still seated at the kitchen table. According to Wilson, defendant said that if Morrison denied having testified against him in a previous trial, defendant would "knock his head off." Morrison did not respond and did not say or do anything to provoke defendant. Defendant then hit Morrison, and Morrison got up from his seat. Defendant and Morrison started scuffling, and Wilson again admonished them that he "wasn't going to have it in [his] house." Wilson got between defendant and Morrison and separated them in order to stop the scuffle.

Morrison again sat down at the kitchen table. As Wilson was pushing against defendant with his shoulder, trying to get him to leave the house, defendant angrily told Morrison that "he wasn't no good" and that Morrison should not have been a witness against him in the earlier murder case. Wilson saw defendant "jiggling" and reaching in his pocket "to get something out," but Wilson could not determine whether the pocket was a pants pocket or a coat pocket. Wilson then heard three gunshots in rapid succession coming from "right over [the] top of [his] head." Wilson testified that he did not see defendant

or anyone else in the house with a handgun. According to Wilson, at the time of the gunshots, defendant was facing the kitchen, and Morrison was seated at the kitchen table.

Following the gunshots, defendant exited through the front door. Wilson went to the front door and observed defendant leave in a "little blue car" being driven by a black female. Wilson then turned around to see if anyone had been struck by the bullets. He heard something fall in the kitchen and ran to the kitchen where he saw that Morrison had been shot. Teasley was standing at the entrance to the kitchen, and Knox was still in the kitchen. Morrison was lying on the kitchen floor on his side and had a small bloodstain on his shirt. Wilson touched Morrison's arm to feel for a pulse, but detected none. Wilson could not determine whether Morrison was breathing. He saw what appeared to be blood flowing from Morrison's mouth. Since Wilson did not have a telephone at his house, he then went outside and directed his neighbors to call for an ambulance. The emergency medical personnel and police arrived, and Wilson informed the police that defendant had shot Morrison.

The State also presented evidence at trial tending to show that defendant had threatened Morrison on several occasions prior to the shooting and that defendant's brothers had made an intimidating visit to Morrison's home in Lexington, North Carolina. The State further presented evidence that, because of these threats, Morrison was afraid of defendant and wanted to avoid him.

Defendant also presented evidence at trial. Defendant testified that he did not see Morrison in Wilson's house on the day of the shooting. However, defendant testified that he did see Jimmy Knox and Johnny Elwood Pless seated in the kitchen with "crack pipes going." According to defendant, he was at the front door when he heard gunshots. Defendant testified that he collided with Wilson as Wilson was trying to enter the front door while defendant was trying to exit. According to defendant, after he exited Wilson's house, he ran to Juanita Keaton's car and left with her. When Keaton asked him what had happened, he responded, "Some crazy m—— f—— in there [was] shooting. Let's get the hell away from here." Defendant denied that he had threatened Morrison after his acquittal for the murder of Calvin Royal at the Busy Bee Lounge. Defendant also denied asking his brothers to threaten Morrison and insisted that his brothers "wouldn't do anything like that." According to defendant, he had contacted some of the persons who testified against him in the trial for

the murder of Calvin Royal and had asked them to testify in support of his civil rights lawsuit.

At trial, defendant also presented the testimony of three witnesses which tended to show that he was not the perpetrator of the crime charged. Dorothea Peggy Ramseur, a witness for the State in the previous trial for the murder of Calvin Royal, testified that, after defendant was acquitted, she encountered defendant at a liquor house. She further testified that defendant did not threaten her and that she even left the liquor house with him. Ramseur also testified that she went to Wilson's house after Morrison was shot, and Wilson told her that he did not know what had happened during the shooting, that he was outside, and that the shooting was over when he reentered the house. Ramseur was in prison at the time she testified in the instant case.

J.D. Sturgis, Jr., testified at trial that he routinely visited Wilson's house to sell or use drugs. After the Morrison shooting at Wilson's house, Sturgis asked Wilson what happened. Wilson told Sturgis that he did not know what happened because everyone ran when the shooting occurred.

Johnny Elwood Pless testified that, on 23 January 1992, he was walking toward Wilson's house to look for his nephew, Keith Neils, when he heard three gunshots and saw several people run out of Wilson's house. According to Pless, defendant and Wilson were "about right at the door" when the second and third shots were fired.

Defendant's motions to dismiss, made at the close of the State's evidence and again at the close of all the evidence, were denied. The jury returned a verdict of guilty of first-degree murder. After a separate sentencing proceeding, the jury recommended and the trial court imposed a sentence of death. Defendant appeals to this Court, making eighteen arguments based on twenty-three assignments of error.

[1]    In his first argument, defendant contends that the trial court erred in overruling his objections to inadmissible hearsay testimony by prosecution witnesses Sandy Williams, Sergeant Michael Flory, and Investigator Michael Grant concerning statements made to them by the victim, Timothy Morrison. These statements concerned (1) threats against Morrison by defendant through Morrison's uncle, and (2) an intimidating visit by defendant's brothers to the victim's home while his girlfriend was present.

During pretrial motions on 15 March 1993, defendant asked the trial court for an instruction to the jury, during the testimonies of Sandy Williams, Michael Flory, and Michael Grant, regarding certain hearsay statements made to these individuals by Morrison. Defendant argued that although these statements may be relevant to show Morrison's state of mind, they "should not be considered and do not have the indicia of reliability to be considered as to infer that the defendant actually made threats against Morrison." The court granted defendant's motion, saying, "[W]hen it comes to that point, you need to request an instruction for the record."

During the State's case-in-chief, the trial court conducted a *voir dire* of Sandy Williams, a victim witness coordinator for the district attorney's office, and Sergeant Michael Flory of the Statesville Police Department. Following the *voir dire* of Williams and Sergeant Flory, the trial court made findings of fact and conclusions of law. The trial court found, *inter alia*, that Williams was a victim witness coordinator during the trial of defendant for the shooting death of Calvin Royal in November 1991 at the Busy Bee Lounge; that a jury found defendant not guilty of second-degree murder in that case; that during the trial, Williams had contacts with Timothy Morrison, who was a witness in that case; that subsequent thereto, Williams arranged the transportation for Morrison to move to Lexington, North Carolina; that on 21 December 1991, a call was received in her office from Morrison; that Williams returned the call on 2 January 1992; that Morrison told her that he had been threatened by defendant; that Morrison also related that defendant had gone by Morrison's uncle's house looking for him and had made the statement that if he caught him, he would shoot him; that Morrison was requesting the district attorney's help in dealing with this situation; that based upon her knowledge of Morrison, Williams formed the opinion that Morrison was upset and detected concern in his voice; and that Morrison also related that defendant's brothers had gone to his home in Lexington, North Carolina.

The trial court further found that, during December 1991 and January 1992, Sergeant Michael Flory was involved with the drug task force; that Morrison was paid as an informer for that task force; that Sergeant Flory had a conversation with Morrison earlier on the day Morrison died; that Morrison told Sergeant Flory that he had been threatened by defendant; that on several other occasions when Sergeant Flory had conversations with Morrison, Morrison expressed concern about threats made by defendant; that on the date in ques-

tion, Morrison told Sergeant Flory that he was going to Harrison Street and that he would try to obtain information, if he did not run into defendant; that Morrison indicated to Sergeant Flory that he was trying to avoid defendant; that Morrison indicated that he was scared that defendant would find him; that Morrison had testified against defendant in a previous second-degree murder case involving an incident at the Busy Bee Lounge in which defendant was found not guilty; that Morrison was fearful of defendant; that Morrison's state of mind and defendant's state of mind were material for the case being tried before the jury; and that there was a factual basis for the alleged fear in that Morrison had testified against defendant in the earlier case.

Based upon these findings of fact, the trial court concluded that there was a factual basis for the alleged fear in that Morrison was a material witness for the State in the case against defendant in regard to the shooting death of Calvin Royal at the Busy Bee Lounge, that evidence relating to the existence of Morrison's mental or emotional state of mind concerning his feelings about defendant was admissible, and that the probative value of that evidence outweighed any prejudicial aspects that the statements may have had in regard to defendant. However, the court ruled that it would allow the State to present the evidence subject to an instruction limiting the purposes for which the testimony could be used.

"Hearsay testimony is not admissible except as provided by statute or by the North Carolina Rules of Evidence." *State v. Wilson*, 322 N.C. 117, 131-32, 367 S.E.2d 589, 597 (1988). In the instant case, the trial court found all of the statements admissible under Rule 803(3) of the North Carolina Rules of Evidence. Rule 803(3) provides that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule. N.C.G.S. § 8C-1, Rule 803(3) (1992). Thus, evidence tending to show a declarant's then-existing state of mind is an exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(3); *State v. Weeks*, 322 N.C. 152, 170, 367 S.E.2d 895, 906 (1988). "[E]vidence tending to show the state of mind of the victim is admissible as long as the declarant's state of mind is relevant to the case." *State v. Jones*, 337 N.C. 198, 209, 446 S.E.2d 32, 38 (1994). However, such relevant evidence is admissible only if its probative value is not substantially outweighed by the potential for unfair prejudice. N.C.G.S. § 8C-1, Rule 403 (1992); *Weeks*, 322 N.C. at 170, 367 S.E.2d at 906. The failure of a trial court to admit or exclude this evidence will not result in the

granting of a new trial absent a showing by the defendant that a reasonable possibility exists that a different result would have been reached absent the error. *State v. Hickey*, 317 N.C. 457, 346 S.E.2d 646 (1987).

In the instant case, Sandy Williams testified, over defendant's objection and after a limiting instruction by the trial court, that she had a telephone conversation with Morrison on 2 January 1992. On direct examination at trial, the following exchange took place:

Q    What was the nature of your conversation with Timothy Morrison over the telephone on January second, 1992?

[DEFENSE COUNSEL]: Objection, Your Honor. Request an instruction.

THE COURT: Objection is overruled. Ladies and gentlemen of the jury, at this time let me instruct you that you are to consider this witness's testimony concerning any statement made to her by Timothy Morrison only to the extent that you find that it indicates ill will or fear on the part of the victim Timothy Morrison by the defendant or the defendant. You may consider it for no other reason in this case.

Q    Would you go ahead and relate what the telephone conversation was about?

A    He said that he had been threatened by Rayford Burke. And that Rayford had been by his uncle's house. And he said that he was looking for him. And if he caught him, he would shoot him. He also said that Rayford's brothers had been by his home in Lexington and that his girlfriend was there. And that he was afraid for his girlfriend and himself.

. . . .

Q    And at some point as a result of that phone call from Timothy Morrison, did you report the nature of the things that were stated by Mr. Morrison in that call to any law enforcement official?

A    I contacted Investigator Mike Grant on January second of '92.

Following the testimony of Williams, Sergeant Michael B. Flory testified that, on the morning of 23 January 1992 at about 9:00 a.m., he saw Morrison at Karen Neils' house. Morrison had called and stated that he wanted to meet with his law enforcement contacts. Sergeant Flory proceeded to Neils' house, met with Morrison, and paid him

$100 for a drug deal that Morrison had arranged the previous day. On direct examination at trial, the following exchange took place:

Q   So you went out there and spoke with him?

A   Yes, ma'am.

Q   And what was the substance of the conversation that you had with him that morning?

A   Our initial trip was to pay him one hundred dollars from a deal that he had done the previous day. During the time we were paying the money, he told me that he had again been threatened by Rayford Burke.

Q   When you say again, had he told you that he had been threatened by Mr. Burke previous to that?

A   Yes, ma'am, he had.

Q   How many times would you say that he told you that he had been threatened by Mr. Burke?

A   Numerous occasions. Almost every time we had a meeting.

Q   And what would he say to you about it?

A   He said he was scared of him and —

[DEFENSE COUNSEL]: Objection, ask for instruction.

THE COURT: Okay, objection is overruled. Ladies and gentlemen of the jury, at this time, let me instruct you that you are to consider this witness's testimony concerning any statements made by Timothy Morrison only to the extent that you find that it indicates ill will or fear on the part of the victim by the defendant or of the defendant. You may consider it for no other reason in this case.

Q   Okay. You indicated he said he was scared of Rayford Burke?

A   Yes, ma'am.

Q   And that was on more than one occasion?

A   Yes, ma'am.

Q   Did he say any—give you any reason of why he was afraid of Rayford Burke?

A   That he had been threatened by Rayford Burke.

STATE v. BURKE

[343 N.C. 129 (1996)]

Q  What exactly did he tell you on the morning of January twenty-third, 1992?

A  Told me that he had been threatened by Rayford Burke and that he wished not to go into any area that Rayford Burke might be, that he was trying to avoid him. He told us that he was going to Harrison Street to work on an investigation that we had previously worked on. . . . That I was to go through Harrison Street about five o'clock that afternoon. And that he would take his hat off if he had any further information for me. And then he said, that is in case—unless I run into Rayford Burke.

We conclude that the trial court's decision to admit the testimony of Williams and Sergeant Flory, which tended to show the victim's state of mind, is in accord with the precedent of this Court. *See State v. Jones*, 337 N.C. at 209, 446 S.E.2d at 39 (trial court did not err in admitting testimony of victim's state of mind regarding the nature of her relationship with defendant notwithstanding that defendant may not have known the statements were made); *State v. McHone*, 334 N.C. 627, 637, 435 S.E.2d 296, 302 (1993) (victim's conversations with three witnesses related directly to the victim's fear of defendant and were admissible to show the victim's state of mind at the time the conversations took place), *cert. denied*, —— U.S. ——, 128 L. Ed. 2d 220 (1994); *State v. Wynne*, 329 N.C. 507, 518, 406 S.E.2d 812, 817 (1991) (testimony concerning victim's fear shortly after being in defendant's presence shows victim's existing state of mind); *State v. Stager*, 329 N.C. 278, 315, 406 S.E.2d 876, 897 (1991) (victim's recorded statements relevant because they tended to disprove the normal loving relationship that defendant contended existed between the two); *State v. Lynch*, 327 N.C. 210, 222, 393 S.E.2d 811, 818 (1990) (evidence of threats of defendant to victim shortly before the murder admissible to show victim's then-existing state of mind); *State v. Faucette*, 326 N.C. 676, 683, 392 S.E.2d 71, 74 (1990) (victim's statements regarding defendant's threats shortly before the murder admissible); *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990) (victim's statements about her husband's threats made three weeks before her disappearance admitted because the victim's state of mind was relevant to the issue of her relationship with her husband).

In the instant case, Morrison's statements to Williams were admissible under Rule 803(3) as a statement of his then-existing state of mind to show the relationship between Morrison and defendant. Since the evidence was competent for this purpose, it does not mat-

STATE v. BURKE

[343 N.C. 129 (1996)]

ter that it may prove some fact that is not relevant or for which the evidence is not competent. *See State v. White*, 331 N.C. 604, 615, 419 S.E.2d 557, 564 (1992). Thus, the trial court did not abuse its discretion in admitting this evidence for the purpose of showing Morrison's then-existing state of mind. We note that at trial defendant objected to the testimony of these witnesses and requested a limiting instruction. In each instance, the court overruled defendant's objection and gave a limiting instruction. The record shows that defense counsel did not object to the instructions.

"A criminal defendant will not be heard to complain of a jury instruction given in response to his own request." *State v. McPhail*, 329 N.C. 636, 643, 406 S.E.2d 591, 596 (1991); *see also State v. Cook*, 263 N.C. 730, 140 S.E.2d 305 (1965); *State v. Plowden*, 65 N.C. App. 408, 308 S.E.2d 918 (1983). Since defendant requested the instruction that he now contends was prejudicial, any error was invited error not entitling defendant to relief on appeal.

[2] Defendant further contends that the trial court erred in admitting testimony by Williams that Morrison told her that defendant's brothers had visited Morrison's house in Lexington, that Morrison's girlfriend was there, and that he was afraid for his girlfriend and himself. Defendant argues that Williams' testimony as to what the brothers said was not subject to any exception to the hearsay rule and that it was reversible error not to exclude it.

After Sergeant Flory's testimony, the State called Investigator Michael Grant as a witness. After testifying about other matters, Investigator Grant offered testimony to corroborate Williams' testimony that Timothy Morrison told Williams, during the 2 January 1992 telephone call, that defendant's brothers had gone to Morrison's house in Lexington when Morrison's girlfriend, Karen Neils, was there and that Morrison told Williams that he was afraid for his girlfriend and for himself.

On direct examination of Investigator Grant, the following exchange took place:

Q   Do you recall, Investigator Grant, earlier in January of 1992, speaking with Sandy Williams?

A   Yes, I did.

Q   Do you recall the nature of the conversation?

STATE v. BURKE

[343 N.C. 129 (1996)]

A   Yes. She had—I believe it to be January twenty-fourth, 1992, Sandy Williams, the assistant—victim assistant coordinator contacted me by the telephone. And she told me that she had—

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained. Members of the jury, this is being offered for corroborating the testimony of an earlier witness. It will be for you to say and determine whether it does in fact corroborate that witness's testimony. It is not being offer [sic] for the truth or falsity of the statement or whether the statement was made on that occasion.

Q   Go ahead.

A   Okay. She related that she had talked to Mr. Morrison. And at this time, she stated that David Burke, the brother of Rayford Burke, had located him in Lexington and had told him if Rayford ever saw Timothy Morrison, he, Rayford Burke, would shoot or kill him, Timothy Morrison.

Defendant argues that Investigator Grant's corroborative testimony concerning what the brothers said was inadmissible hearsay. Defendant contends that under Rule 403, if this evidence has any probative value at all, such value is substantially outweighed by the danger of unfair prejudice from the obvious but unwarranted speculation that defendant somehow encouraged his brothers to intimidate Neils.

We agree with defendant that the testimony of Williams and Investigator Grant concerning what the brothers said was inadmissible because the brothers' state of mind was not relevant and could not be used to show defendant's state of mind. Nevertheless, we conclude that this error was not prejudicial. First, we note that the trial court granted defendant's request for an instruction limiting the purposes for which the evidence could be used. Furthermore, with reference to Investigator Grant's testimony, the court instructed the jury that the testimony was to be used for no other purpose than to corroborate Williams' testimony. In addition, the jury was aware through Williams' testimony that Morrison had testified against defendant on a previous murder charge, which would provide a factual basis for Morrison's fear of defendant. Furthermore, Jesse Wilson had testified that when defendant entered the house, he got into an altercation about Morrison's testimony in the prior trial. Under these circumstances, we conclude that defendant has failed to demonstrate that a reasonable possibility exists that, had this evidence been excluded, a

different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988); *State v. Bryant*, 337 N.C. 298, 311, 446 S.E.2d 71, 78 (1994).

**[3]** In his second argument, defendant contends that the trial court erred by not conducting an inquiry into the precise content and possible impact of an incorrect and prejudicial statement made by outsiders which may have been heard by a juror during the guilt-innocence phase of the trial. While the jury was out of the courtroom, the trial court announced that during a recess, juror Kennedy had possibly overheard unidentified people in the canteen say that defendant had been involved in two other murders or two other murder cases. In a conference at the bench, the following exchange took place:

THE COURT: Okay, let the record show that at the end of the recess period, the Court was approach [sic] by counsel for the State and by the defense. Counsel for the State indicating that during the recess period, that an attorney who was in the area of the canteen area overheard individuals, citizens engaged in conversation about that the defendant had been—what was the statement?

[STATE]: I believe it was something to the effect that this guy has been involved in two other cases—two other murders.

THE COURT: Two other murders. That this statement was in made in the—may have been made in the presence of a juror in this case, Juror McKinney?

[STATE]: Kennedy, Your Honor.

THE COURT: Kennedy. That the Court has made counsel for the State and for the defense aware that the Court is willing to bring that juror in and question him as to whether he in fact heard anything or overheard any conversation. That after consultation with the defense team with the defendant, that the defense team has indicated at the bench that they did not wish to question the juror about that matter, but would request that the Court take steps to assure that jurors had no further contact with individuals who might be in the canteen area. Is that the—

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: On behalf of the defense, you do not wish to question the juror?

**STATE v. BURKE**

[343 N.C. 129 (1996)]

[DEFENSE COUNSEL]: That's correct.

Following this exchange, the court instructed (1) that a court officer be assigned to the jurors and that they be kept on the floor on which the trial was taking place, (2) that everyone remain in the courtroom until jurors exited or completely left the building at any recess or break periods throughout the remainder of the trial, (3) that a law enforcement official assigned to the jury service bring back from the canteen any items requested by jurors, and (4) that spectators and witnesses not have any contact with the jurors or make any statements in their presence.

We note that the record clearly shows that the court asked if defense counsel wanted the court to conduct an inquiry and that, after consultation between defendant and defense counsel, defense counsel declined. Defendant now argues that, although North Carolina law vests a trial judge with discretion to determine the procedure and scope of the inquiry, the law does not give the trial judge any discretion about whether to conduct an inquiry. Defendant contends that a trial judge must do so, at least where, as in this case, the statement, if heard by the juror, would obviously be prejudicial.

We agree that when a trial court learns of an alleged improper contact with a juror, or of a prejudicial statement inadvertently overheard by a juror, the trial court's inquiry into the substance and possible prejudicial impact of the contact is a vital measure for ensuring the impartiality of the juror. *Remmer v. United States*, 347 U.S. 227, 98 L. Ed. 2d 654 (1954). In *State v. Willis*, 332 N.C. 151, 420 S.E.2d 158 (1992), this Court stated that "[i]n the event of some contact with a juror it is the duty of the trial judge to determine whether such contact resulted in substantial and irreparable prejudice to the defendant. It is within the discretion of the trial judge as to what inquiry to make." *Id.* at 173, 420 S.E.2d at 168.

In this case, we first note that there is no contention that a spectator actually talked to the juror, only that the juror may have inadvertently overheard prejudicial conversation. Defendant declined the judge's offer to make an inquiry of the juror in order to determine whether the juror had overheard the conversation. Furthermore, the judge instituted special measures to insulate the jury from exposure to any casual conversations between spectators. Under these circumstances, we conclude that the trial judge properly exercised his discretion in not making further inquiry into this matter.

[4] In his third argument, defendant contends that the trial court erred in overruling his objection to cross-examination of defendant about the details of two crimes for which defendant had prior convictions: misdemeanor assault with a deadly weapon of Jerry Roseboro and misdemeanor assault with a deadly weapon of George Melvin Anthony. Defendant argues that when a party impeaches the credibility of a witness under Rule 609, counsel may not inquire into the details of the crime leading to the conviction. *State v. Lynch*, 334 N.C. 402, 432 S.E.2d 349 (1993) (impeachment under Rule 609 is limited to the name of the crime, the time and place of the conviction, and the punishment imposed). However, the instant case is distinguishable from *Lynch*.

In *Lynch*, the trial court overruled defendant's numerous objections to the State's cross-examination regarding details of defendant's prior convictions. In the instant case, however, the trial court did not overrule defense counsel's objection to his client's attempt to explain the circumstances surrounding the assault on Jerry Roseboro, but simply responded: "He may explain his answer if he wishes to do that." Our reading of the transcript suggests that defendant elected to offer a detailed explanation of the circumstances which led to his prior conviction for the assault of Roseboro in order to inform the jury that Roseboro had testified in the previous trial that Roseboro had stabbed defendant first. Because defendant elected to explain the circumstances surrounding the crime, he may not obtain a new trial based on his own election to testify about these matters.

As to the prosecutor's questioning about defendant's assault upon George Melvin Anthony, defendant concedes that he failed to object to this cross-examination, but argues that such an objection would have been futile in view of the trial court's "overruling of the objection to identical cross-examination about the assault against Mr. Roseboro." However, as we noted earlier, the trial court did not overrule defendant's objection; it merely permitted defendant to explain his answer if he desired to do so. Here, the prosecutor simply asked defendant, with respect to the assault on Anthony, "Was that self-defense too?" Defendant responded, "I was into it with Mr. Anthony and several other people. Whatever you may want to call it." We conclude that the trial court did not err in permitting defendant to respond to the prosecutor's question. Accordingly, we reject defendant's third argument.

STATE v. BURKE

[343 N.C. 129 (1996)]

[5]  In his fourth argument, defendant contends that the trial court erred in overruling his objection to the State's "prejudicially improper" question to a prosecution witness about the witness' request for relocation. On direct examination of Jimmy Knox during trial, the following exchange took place:

Q  Mr. Knox, you came and talked to [the prosecutor] about this case?

A  Yes, ma'am.

. . . .

Q  And when we talked with you about testifying, did you want to come here and testify?

A  No, ma'am.

[DEFENSE COUNSEL]: Objection to leading.

THE COURT: Sustained.

THE WITNESS: No, ma'am.

Q  Do you want to testify—did you want to testify in this case, Mr. Knox?

A  After a while, I thought about it, I said Timmy was my friend. And if—if—if he would have missed him, he could have killed me. That's—because he—I was sitting right there behind him.

Q  Did [the prosecutors] offer to help you in any way if you came and testified in this case?

A  No, ma'am.

Q  Well, we talked about helping you relocate to another area outside of Statesville?

[DEFENSE COUNSEL]: Objection to leading.

THE COURT: Sustained.

. . . .

Q  Do you remember anything that we told you that we would help you do?

A  I—I—I asked you all, I said, I can't testify against that man. He done killed one man.

[DEFENSE COUNSEL]: Objection, excepts [sic] to the extent it corroborates.

THE COURT: Overruled. Go ahead and answer the question.

THE WITNESS: I asked you all, where did I live at. Because I lived with my parents. And I didn't want nobody come to my parents' house and shooting up my family like that, you know. Could you all help me relocate.

Q   And did we tell you that we would try to do that?

A   Yes, ma'am.

Defendant contends that this testimony should have been excluded under Rule 404(a), which prohibits evidence that a defendant acted in conformity with a trait of his character. Defendant argues that the clear purpose of this testimony by Jimmy Knox was to show that defendant has such a violent character that he would kill anyone who testified against him. Defendant further contends that the unfair prejudice of this testimony substantially outweighed any probative value under Rule 403.

The State argues, however, that the evidence concerning Knox's inquiry about relocation was relevant not to show defendant's violent or criminal disposition, but to explain why Knox initially did not want to testify against defendant and why Knox could have made statements indicating that he could not remember what happened during the shooting at Wilson's house. We agree. Knox's testimony showed that he was fearful of testifying against defendant, having witnessed defendant shoot and kill Morrison in retaliation for Morrison's having testified against defendant in a previous trial. Thus, the testimony was not admitted to prove defendant's character or that defendant acted in conformity therewith so as to require exclusion under Rule 404(a). We further conclude that the probative value of Knox's testimony was not substantially outweighed by the danger of unfair prejudice to defendant so as to require exclusion under Rule 403. Accordingly, we reject defendant's fourth argument.

[6]   In his fifth argument, defendant contends that the trial court erred in overruling his objection to irrelevant lay opinion testimony by a prosecution witness about the victim's state of mind a few weeks before his death. Patty West, director of women's and children's services at the Fifth Street Shelter Ministries, testified that Morrison stayed at the shelter for several weeks before his death on 23 January

1992. West testified, over defendant's objection, that "[t]here were times that I—when we would—during certain conversations that I felt like he [Timothy Morrison] was tense or, you know, scared of something." Defendant contends that the trial court erred in overruling his objection to this testimony because West's lay opinion about Morrison's state of mind was so vague that it was irrelevant and therefore inadmissible under Rule 402. Rule 402 provides in pertinent part that "[e]vidence which is not relevant is not admissible." N.C.G.S. § 8C-1, Rule 402 (1992). Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992).

We have held that opinion testimony, including lay opinion testimony, is admissible concerning the state of a person's appearance or emotions on a given occasion. *State v. Gallagher*, 313 N.C. 132, 138, 326 S.E.2d 873, 878 (1985). Here, the testimony by West that Morrison appeared to be "tense" and "scared of something" during certain conversations with her described Morrison's emotional state during the time he was in her presence at the shelter. We conclude that such evidence was admissible as tending to shed light upon Morrison's state of mind at that particular time. *See State v. McHone*, 334 N.C. 627, 435 S.E.2d 296. We reject defendant's further contention that, even if relevant, the probative value of this evidence was substantially outweighed by its unfair prejudice to defendant and it thus should have been excluded under Rule 403.

[7] In his sixth argument, defendant contends that the trial court erred in overruling his objection to the State's introduction of extrinsic evidence to impeach the credibility of a defense witness on a collateral matter. The impeachment in question concerned Juanita Keaton's employment. Keaton testified on direct examination that she was a licensed practical nurse. During cross-examination, in response to a question by the prosecutor, Keaton agreed that she had told the prosecutor during a pretrial telephone conversation that she would be assisting as a nurse in a brain surgery operation during the week of 15 March 1993. The prosecutor expressed skepticism as to Keaton's statement and cross-examined Keaton about it.

After the defense rested its case, the State introduced rebuttal testimony through Dorra Mack, a registered nurse who had been Keaton's supervisor. During direct examination, Mack testified that Keaton had been hired as a certified nursing assistant and, to the best

of her knowledge, was not a licensed practical nurse. Mack further testified, over defendant's objection as to relevancy, that the duties that a certified nursing assistant can legally perform in the State of North Carolina include "[a]ssist[ing] with personal care, which is bathing, assisting with dressing, cooking, light housekeeping, grocery shopping, those types of duties." Mack further expressed doubt that a certified nursing assistant could assist in a brain surgery operation. Defendant contends that the State's introduction of this testimony was improperly calculated to ridicule and impeach the testimony of Keaton, an important defense witness.

The general rule is that once a witness testifies about a collateral matter on cross-examination, the cross-examiner, who draws out such answers, is bound by the answers of the witness and will not be permitted to contradict them by the testimony of others. *See* Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 160 (4th ed. 1993) ("contradiction of collateral facts by other evidence is not permitted"). Assuming *arguendo* that the trial court erred in allowing Mack to testify as to a collateral matter, we conclude that defendant has not met his burden of showing that there is a reasonable possibility that had the error not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a). We first note that the State thoroughly cross-examined Keaton about her education, qualifications, and employment. We further note that while Keaton was an important defense witness, she was not present inside the house at the time of the shooting. Although she testified that she saw defendant standing in the doorway to Wilson's house, she also testified that she did not hear any gunshots. The import of Keaton's testimony to the defense was that she testified she did not see defendant in possession of a handgun on the day of the shooting. Accordingly, we reject defendant's sixth argument.

[8] In his seventh argument, defendant contends that the trial court erred in refusing to allow his counsel to question prosecutors, members of the prosecutorial staff, and law enforcement officers about their decision not to seek to have Jesse Wilson, a key prosecution witness, arrested on outstanding warrants for his arrest prior to his testimony in this trial. Defendant contends that such examination was permissible for the purpose of impeaching Wilson on the ground of bias.

Before ruling upon defendant's request to examine these persons, the trial court held a lengthy *voir dire*. Both prosecutors testified dur-

ing the *voir dire* and were cross-examined by defendant. The prosecutors testified that Wilson had been arrested on drug charges; that Wilson failed to appear in district court; that the State took dismissals with leave in regard to the charges; that the officer who served the subpoena for Wilson to appear and testify in the instant case was unaware of the outstanding warrants for Wilson's arrest; that the district attorney's office, once Wilson was located, decided not to process him unless he failed to appear in this case; and that the prosecutors in this case refused to discuss the pending charges with Wilson since he was a witness for the State in this case. Upon this evidence, the court denied defendant's request, concluding that "there were no promises, offers or reward or inducements to . . . the witness Jesse Wilson by any official of the prosecutorial staff or by any law enforcement official."

Defendant contends that the *voir dire* testimony should have been heard by the jury because it would show Wilson's bias in that he had an inducement to appear as a prosecution witness in this trial. We find no error. First, there was no evidence presented at the *voir dire* to show that Wilson had received, or had been promised, favors from the State. Further, the evidence shows that, although the prosecutors withheld service of the warrants for arrest, they refused to discuss the pending charges with Wilson since he was a witness for the State in this case. Defendant's interest was in showing the bias of Wilson in that he was testifying for the State because they were withholding outstanding warrants for his arrest. The record shows that defendant cross-examined Wilson as to the nature of the charges pending against him and the reason he had not been arrested. Wilson testified that no one had offered him any concessions in exchange for his testimony. We note as well that during the testimony of law enforcement officers, defendant did not attempt to question them about their failure to serve the outstanding warrants for arrest upon Wilson. We hold that the trial court did not err in denying defendant's request to have the prosecutors and members of the prosecutorial staff testify before the jury about the reason for the unserved warrants for Wilson's arrest. Accordingly, we reject defendant's seventh argument.

[9] In his eighth argument, defendant contends that the trial court committed plain error by not instructing the jury that a killing is not done with deliberation if a defendant forms the intent to kill during a quarrel or struggle. We reject this argument since no evidence presented at trial shows that defendant formed the intent to kill during a quarrel or struggle.

The only provocation shown by the evidence as to the victim, Morrison, was the fact that he had previously testified against defendant. Defendant's evidence was to the effect that he did not see Morrison at the house and did not shoot him. The State's evidence was to the effect that Morrison, rather than provoking defendant, not only acceded to defendant's wishes by sharing his bottle of gin with him but also by not responding violently to defendant's aggressive efforts to provoke him. The victim was seated at the table when he was shot. Under these circumstances, the trial court correctly denied defendant's request and charged the jury in accordance with North Carolina Pattern Instructions, N.C.P.I.—Crim. 206.10 (1989), as follows:

> [T]he State must prove that the defendant acted with . . . deliberation, which means that he acted while he was in a cool state of mind. This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, *not under the influence of some suddenly aroused violent passion*, it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect.

Accordingly, we reject defendant's eighth argument.

[10]  In his ninth argument, defendant contends that the trial court erred in instructing the jury that it could consider evidence that defendant fled the scene of the shooting as evidence of his guilt. Defendant acknowledges that this Court has decided against his position on this issue. *See State v. Moseley,* 338 N.C. 1, 36, 449 S.E.2d 412, 434 (1994) (A trial court may properly instruct on flight "[s]o long as there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged."), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 738 (1995); *State v. Tucker,* 329 N.C. 709, 722, 407 S.E.2d 805, 813 (1991) ("[F]light from a crime shortly after its commission is admissible as evidence of guilt."). We hold that the record in this case includes such evidence and see no reason to abandon the precedent of this Court based on defendant's arguments. Accordingly, we reject defendant's ninth argument.

[11]  We conclude for the foregoing reasons that defendant's trial was free of prejudicial error. Thus, we now turn to defendant's assignments of error relating to the separate capital sentencing proceeding conducted in this case. In his first sentencing issue, defendant contends that the trial court erred in instructing the jury to consider defendant's conviction for a felonious assault with respect to the

aggravating circumstance of prior conviction for a violent felony, where the conviction for that offense occurred after defendant's alleged commission of the capital murder.

Defendant argues that in submitting the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance, the trial court erred in instructing the jury that it could consider a conviction in June 1992 for assault with a deadly weapon inflicting serious injury, which occurred in December 1991. Defendant contends that the trial court's submission of the June 1992 assault conviction was erroneous because defendant was not convicted of the assault until after 23 January 1992, the date of the capital murder in this case. Defendant contends that the plain language of the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance makes it clear that the two times relevant to that circumstance are the date of a defendant's conviction for the aggravating violent felony and the date of the commission of the capital murder.

N.C.G.S. § 15A-2000(e)(3) lists the following as an aggravating circumstance: "The defendant had been previously convicted of a felony involving the use or threat of violence to the person." Defendant acknowledges that in *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981), and *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979), this Court stated that the relevant event with respect to this aggravating circumstance is the date of the commission of the violent felony, rather than the date of the conviction. However, defendant argues that the Court's brief analysis of that issue in *Silhan* and *Goodman* was dictum with respect to this issue because the Court did not have to squarely address the precise timing issue raised here to reach its holding in either *Silhan* or *Goodman*.

In *State v. Goodman*, this Court said:

> G.S. 15A-2000(e)(3) states that one of the aggravating factors which may justify the imposition of the death penalty is the fact that the "defendant had been previously convicted of a felony involving the use or threat of violence to the person." This section requires that there be evidence that (1) defendant had been convicted of a felony, that (2) the felony for which he was convicted involved the "use or threat of violence to the person," and that (3) *the conduct upon which this conviction was based was conduct which occurred prior to the events out of which the capital felony charge arose.* If there is no such evidence, it would be improper for the court to instruct the jury on this subsection.

> . . . .

. . . [W]e believe that the "previously convicted" language used by the legislature in subsection (e)(3) refers to *"criminal activity conducted prior to the events out of which the charge of murder arose." State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849 (1977); *see also, State v. Rust,* [197 Neb. 528, 250 N.W.2d 867, *cert. denied,* 434 U.S. 912, 98 S. Ct. 313, 54 L. Ed. 2d 198 (1977)]; *State v. Holtan,* 197 Neb. 544, 250 N.W.2d 876, *cert. denied,* 434 U.S. 912, 98 S. Ct. 313, 54 L. Ed. 2d 198 (1977). To decide otherwise would lead to unnecessary duplication within the statute, for G.S. 15A-2000(e)(5) enumerates those felonies which occur simultaneously with the capital felony which the legislature deems worthy of consideration by the jury. It would be improper, therefore, to instruct the jury that this subsection encompassed conduct which occurred contemporaneously with or after the capital felony with which the defendant is charged.

*Goodman,* 298 N.C. at 22-23, 257 S.E.2d at 583-84 (emphases added).

In *State v. Coffey,* 336 N.C. 412, 444 S.E.2d 431 (1994), we stated:

In *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979), we held that [the aggravating circumstance found at N.C.G.S. § 15A-2000(e)(3)] *does not include crimes committed after the murder.* Recognizing the relationship between this circumstance and the mitigator pertaining to defendant's history of prior criminal activity, it has been stated: "Just as prior conviction of a felony involving violence is designated an aggravating circumstance, the absence of any significant history of prior criminal activity calls for mitigation of sentence." II Model Penal Code § 210.6 commentary at 137 (1980). To the extent that the mitigating circumstance of "no significant history of prior criminal activity" is related to the aggravating circumstance that "defendant had been previously convicted of a felony involving the use or threat of violence," it seems clear that the legislature intended the same time frame to be used in both circumstances. Thus, the aggravating circumstance in N.C.G.S. § 15A-2000(e)(3) is some indication that the mitigating circumstance of no significant history of prior criminal activity does not include crimes committed after the murder.

*Coffey,* 336 N.C. at 418-19, 444 S.E.2d at 435 (emphasis added).

The rationale for this aggravating circumstance seems to be that it is more egregious for a person to commit first-degree murder after

having previously committed a violent felony against the person of another. While this aggravating circumstance could not be submitted to the jury prior to a conviction, there is no requirement that the conviction occur prior to the capital murder so long as the conduct giving rise to the conviction occurred prior to the events out of which the capital murder arose. The "previously convicted" language used by the legislature in N.C.G.S. § 15A-2000(e)(3) simply establishes a more reliable means of assuring that the defendant is guilty of the violent felony. Ordinarily, whether the defendant has been convicted is a matter of public record and is beyond dispute. However, if the crime for which the defendant has been convicted does not have as an element the use or threat of violence to the person or if the defendant denies that he was the defendant shown on the conviction record, that he was convicted, or that the crime involved the use or threat of violence, it may become necessary for the State to present the testimony of the victims themselves. *See State v. Silhan*, 302 N.C. at 272, 275 S.E.2d at 484. Therefore, it is not necessary that a defendant be convicted before the commission of the capital murder so long as defendant has been convicted of the violent felony prior to the capital trial. *See State v. Lyons*, 343 N.C. 1, 22, 468 S.E.2d 204, 214 (1996). Thus, we find no error in the trial court's jury instruction allowing the jury to consider defendant's June 1992 conviction for a violent felony which was committed prior to the events out of which the capital murder arose. Accordingly, we reject defendant's argument.

[12] Defendant next contends that the trial court erred in instructing the jury to consider defendant's conviction for felonious breaking or entering with respect to the aggravating circumstance of prior conviction of a violent felony, since the evidence was not sufficient to show that the offense was violent. Although defendant initially was charged with the sexual assault of a four-year-old child, he pleaded guilty only to felonious breaking or entering, and the sexual assault charge was dismissed with prejudice. Defendant now argues that there was no evidence that he broke into the apartment rather than merely entering an open or unlocked door and that there was no evidence that he ever assaulted, attempted to assault, threatened to assault, or even touched the child.

In *State v. Green*, we said:

Under N.C.G.S. § 15A-2000(e)(3), a prior felony can be either one which has as an element the use or threat of violence to the per-

son, such as rape or armed robbery, or a felony which does not have the use or threat of violence to the person as an element, but as to which the use or threat of violence to the person was actually involved.

336 N.C. 142, 168, 443 S.E.2d 14, 29 (1994) ("Attempting to commit a crime which inherently involves violence obviously constitutes, at least, a 'threat of violence.' "), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

In the instant case, the State presented evidence that, on 15 December 1987, defendant pleaded guilty and was convicted of felonious breaking or entering with intent to commit a sexual assault against a four-year-old child. The child's mother testified that on 15 December 1987, she briefly left her apartment, leaving her two children inside. When she returned to her apartment, the four-year-old was "screaming and hollering" at defendant. The four-year-old child was wearing only panties and a T-shirt, but had been fully dressed when her mother left the apartment. Defendant was in the bathroom, washing his penis in front of the one-year-old child. Defendant replied, "Ha," when the children's mother confronted him about what he had done. Defendant's hat was found on the four-year-old child's bed. Based upon this evidence, the jury reasonably could have found that defendant broke and entered the apartment with the intent to commit a sexual assault upon a four-year-old child and that the crime involved at least a "threat of violence." Thus, we are satisfied that there was sufficient evidence to support the jury's finding of the aggravating circumstance that defendant had previously been convicted of a crime involving the use or threat of violence. Accordingly, we reject defendant's argument.

### Preservation Issues

[13-17] Defendant raises six additional arguments which he concedes have been decided against him by this Court: (1) the trial court erred in granting the State's motion to prohibit defendant's closing argument about residual doubt and by denying defendant's request to submit residual doubt as a mitigating circumstance; (2) the trial court violated his due process right to an impartial jury by denying his motion to permit questioning of prospective jurors on parole eligibility; (3) the trial court's capital sentencing jury instructions that defined defendant's burden of persuasion to prove mitigating circumstances as evidence that "satisfies" each juror violated due process and the Eighth and Fourteenth Amendments because that definition

STATE v. BURKE

[343 N.C. 129 (1996)]

did not adequately guide the jury's discretion about the requisite degree of proof; (4) the trial court violated the Eighth and Fourteenth Amendments by allowing the jury to refuse to give effect to mitigating evidence if the jury deemed the evidence not to have mitigating value; (5) the trial court erred in allowing jurors not to give effect to mitigating circumstances found by the jurors; and (6) the trial court erred in permitting defense counsel to accede to defendant's choice to present the defendant's penalty phase case without witnesses from defendant's family and without a psychiatric examination of defendant, thereby depriving defendant of his right to counsel under the Sixth and Fourteenth Amendments.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for any possible further judicial review of this case. We have carefully considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Accordingly, we reject these arguments.

PROPORTIONALITY REVIEW

[18] Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. It is our duty in this regard to ascertain: (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2) (Supp. 1995).

In this case, the two aggravating circumstances submitted to and found by the jury were that defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3), and that the murder was committed against a former witness against the defendant because of the exercise of his official duty, N.C.G.S. § 15A-2000(e)(8). After thoroughly examining the record, transcripts, and briefs in the present case, we conclude that the record fully supports the two aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of pas-

sion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). None of the cases in which this Court has determined the death penalty to be disproportionate has included the (e)(3) aggravating circumstance. *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 752 (1995); *State v. Keel*, 337 N.C. 469, 447 S.E.2d 748 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 147 (1995); *State v. Reeves*, 337 N.C. 700, 448 S.E.2d 802 (1994); *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant here was convicted of first-degree murder under the theory of premeditation and deliberation. The jury found that defendant had been previously convicted of a felony involving the use or threat of violence to the person and that the murder was committed against a former witness against the defendant because of the exercise of his official duty. Although the jury considered seventeen mitigating circumstances, it found only ten. Of these ten, only one was a statutory mitigating circumstance, that the capital felony was committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2).

It is also proper to compare this case to those where the death sentence was found proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we have repeatedly stated that we review all of the cases in the pool when engaging in our statutory duty, it is worth noting again that "we will not undertake to discuss or cite all of those cases each time we carry out our duty." *Id.* It suffices to say

here that we conclude the present case is similar to certain cases in which we have found the death sentence proportionate.

There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to sustain death sentences; the (e)(3) aggravator is among them. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 1083 (1995). This Court has also noted that the (e)(3) aggravating circumstance "reflect[s] upon the defendant's character as a recidivist." *Brown*, 320 N.C. at 224, 358 S.E.2d at 30. As we said earlier, there was sufficient evidence introduced at trial from which the jury could find that defendant had been previously convicted of a felony involving the use or threat of violence.

Further, the jury found that the murder was committed against a former witness against the defendant because of the exercise of his official duty. This Court has said that the (e)(8) aggravating circumstance reflects the General Assembly's recognition of the "common concern" that "the collective conscience requires the most severe penalty for those who flout our system of law enforcement." *Id.* at 230, 358 S.E.2d at 33. Defendant here does not contest the (e)(8) aggravating circumstance. The evidence of defendant's guilt was clear. Defendant shot the victim in cold blood before three eyewitnesses because the victim had testified against him in a previous murder trial. Our system of justice demands that the law protect a former witness against the defendant who testified in the exercise of his official duty.

After comparing this case to other roughly similar cases as to the crime and the defendant, we conclude that this case has the characteristics of first-degree murders for which we have previously upheld the death penalty as proportionate. Accordingly, we cannot conclude as a matter of law that the death sentence was excessive or disproportionate. Therefore, the judgment of the trial court must be and is left undisturbed.

NO ERROR.