An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-1061

Filed 15 October 2025

Edgecombe County, No. 21CRS051740-320

STATE OF NORTH CAROLINA

v.

JOSEPH NUNEZ

Appeal by defendant from judgment entered 29 March 2023 by Judge William D. Wolfe in Edgecombe County Superior Court. Heard in the Court of Appeals 24 September 2025.

> *Attorney General Jeff Jackson, by Director of Major Litigation Brian D. Rabinovitz, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Daniel Shatz, for the defendant-appellant.*

TYSON, Judge.

Joseph Nunez ("Defendant") appeals from judgment entered on a jury's verdict of guilty, convicting him of second-degree murder. Our review discerns no error.

## I. Background

Defendant was released from the Nash County Detention Center ("NCDC")

after being incarcerated for eight months on 3 October 2021. Defendant was issued a debit card with his remaining inmate trust account fund balance of $100.08 upon his release.

Defendant met his girlfriend, Michelle Nevel ("Nevel"), at a convenience store in Rocky Mount after she got off work. Defendant and Nevel purchased alcohol using Defendant's NCDC-issued debit card. Nevel also called Tom Alford ("Alford") to meet them at the convenience store to purchase $20 worth of crack cocaine from him. Defendant and Nevel had asked Alford to drive them to other convenience stores to get money from Defendant's NCDC-issued debit card, but he was unsuccessful in accessing the funds.

Before Alford dropped Defendant and Nevel back at the original convenience store, they asked Alford about Morris Joyner ("Joyner"). Joyner was staying at Alford's house at the time. Alford told Defendant and Nevel that Joyner was not around. When Alford returned home that afternoon, he told Joyner Defendant and Nevel had asked about him, and Defendant did not have any money from his NCDC-issued debit card.

Later that evening, Joyner called his daughter to pick him up from Alford's house. Joyner was outside in Alford's backyard waiting for his daughter, Alford was inside watching TV and using his continuous positive airway pressure (CPAP) machine.

After purchasing the alcohol and cocaine earlier in the day, Defendant and

Nevel went to a friend's home and drank the alcohol. Defendant and Nevel decided to walk home from the friend's house. Their route home took them past Alford's house and Defendant wanted to stop by. Nevel waited in front of the house while Defendant went around to the backyard. After a short period of time, Defendant called for Nevel to also come to the backyard.

Defendant told Nevel he had given Joyner his NCDC-issued debit card, leading her to presume Defendant owed Joyner money and this was his means of paying Joyner back. Nevel testified Defendant and Joyner were engaging in normal conversation, but another witness told Defendant and Joyner they needed to leave Alford's house.

Defendant told Joyner he wanted his debit card back, but Joyner declined and told Defendant, "You're gonna make me beat your ass." Defendant offered to go with Joyner to an ATM to get money to pay him back if Joyner returned his card. Joyner countered by hitting Defendant in the face.

A fight ensued, and Defendant was seen on top of Joyner punching him. Nevel attempted to break up the fight. Nevel says she eventually tried to get Alford's attention, while he was inside the house, to aid in breaking up the fight. Alford came outside, grabbed a weapon from the back of his vehicle and hit Defendant in the face with it, knocking Defendant out for a moment. Alford checked on Joyner before hitting Defendant again, this time in the leg, as he was coming back to consciousness. Alford testified after Defendant came to, Defendant was still trying to continue to hit

Joyner. Defendant and Nevel left Alford's house.

Alford said his son had alerted him to the altercation between Defendant and Joyner, not Nevel, like she had testified. According to Alford, when he came out the back door of the house and saw Defendant was on top of Joyner. Alford testified Joyner was lying on his back and was not fighting back. While Defendant was passed out from Alford hitting him, Alford called his neighbor, Vincent Silver, to take Joyner to the hospital. Silver testified when he arrived at Alford's house to help, he located Joyner on the ground under the edge of the picnic table. Joyner was making a gurgling sound. Silver put Joyner in the bed of his truck and took him to the hospital where he was pronounced dead.

Law enforcement officers were alerted after they questioned Silver at the hospital regarding Joyner's condition. Silver spoke with Alford on the phone, who told Silver he did not want the "commotion" of having police officers at his house. As a result, when Silver initially spoke with the officers, he told them he had picked up Joyner by the side of the road near the park. Police officers asked him to show them where he claimed to have picked up Joyner near the park. Silver realized he had to tell the truth, so later that night, he told Detective Joshua Talley he had picked up Joyner outside at Alford's house.

Officers went to canvas Alford's neighborhood to locate the scene of the crime. While doing so, the officers saw Defendant and Nevel. Defendant was obviously injured and bleeding extensively. Emergency medical services ("EMS") was called to

the scene. Defendant told officers he had injured himself by falling off his skateboard, while trying to do tricks. Defendant initially declined any services from EMS, but he was eventually transported to the hospital by EMS. Defendant suffered a severe laceration on his forehead, a broken wrist, a broken ankle, and contusions on his leg.

At trial, the State called Randall Falls, D.O., the forensic pathologist who had performed the autopsy of Joyner. Dr Falls was stipulated as an expert in forensic pathology. Dr. Falls testified Joyner died as a result of multiple blunt force injuries, including intracranial and sub-scalp hemorrhages; multiple contusions, abrasions, and lacerations to the upper body and face with associated facial fractures; a fracture of the left hyoid bone; and atlanto-occipital disarticulation, where the base of the skull had separated from the first cervical vertebra. During the autopsy, Joyner's personal effects were collected as evidence. Defendant's NCDC-issued debit card was found inside of Joyner's wallet.

During cross-examination, Defendant's counsel questioned Dr. Falls using a toxicology report tending to show Joyner's body had a blood alcohol concentration of .22 and positive for the presence of cocaine and cocaine metabolites. Although Defendant did not move to admit the report into evidence, the trial court later ruled Defendant had presented evidence because the State had not presented or referenced the report on direct examination, and Dr. Falls had read from it on cross-examination after Defendant's counsel had provided him a copy and had asked questions about the report's contents. Based upon that ruling, the court determined Defendant had

"presented evidence" and denied Defendant the right to deliver both the opening and closing arguments to the jury.

At the close of evidence, the trial court instructed the jury on potential verdicts of second-degree murder, voluntary manslaughter, involuntary manslaughter and not guilty. The jury returned a verdict of guilty and convicting Defendant of second-degree murder. The trial court sentenced Defendant in the presumptive range as a prior record level II offender with three prior record points to an active term of 250 to 312 months' imprisonment. Defendant timely appealed.

## II.    Jurisdiction

This Court possesses jurisdiction pursuant to N.C. Gen. Stat. § 7A-27(b) (2023).

## III.    Issues

Defendant argues the trial court erred by denying him the right to make the first and last closing arguments and committed plain error by permitting the State to elicit testimony from a witness regarding Defendant's prior incarceration, constituting impermissible character evidence.

## IV.    Closing Argument

Defendant argues the trial court erred by denying him the right to make the first and last closing arguments. "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the

specific grounds were not apparent from the context." N.C. R. App. P. 10. "It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion." *Id.*

"[I]ssues and theories of a case not raised below will not be considered on appeal." *Westminster Homes, Inc. v. Town of Cary Zoning Bd. of Adjust.*, 354 N.C. 298, 309, 554 S.E.2d 634, 641 (2001). "This Court will not consider arguments based upon matters not presented to or adjudicated by the trial court. Even alleged errors arising under the Constitution of the United States are waived if defendant does not raise them in the trial court." *State v. Haselden*, 357 N.C. 1, 10, 577 S.E.2d 594, 600 (citations and quotation marks omitted), *cert. denied*, 540 U.S. 988, 157 L. Ed. 2d 382 (2003).

After the State argued Defendant had presented evidence by providing and eliciting testimony regarding the contents of the toxicology report during the State's case in chief. Defendant responded and argued he had not introduced the toxicology report into evidence. The trial court disagreed and ruled Defendant presented evidence by providing a copy of the toxicology report to Dr. Falls and asking Dr. Falls to read from the report to the jury, while he was on the witness stand.

After the Court's ruling, Defendant's counsel was permitted to reopen Defendant's case-in-chief and introduced the toxicology report, without objection from the State. Defendant failed to object to the court's ruling he had presented evidence, Defendant introduced the report after the Court ruled, and did not object before either

the State's or his closing arguments. N.C. R. App. P. 10(a)(1). Defendant failed to preserve this issue for appellate review. Defendant's argument is overruled and dismissed.

## V. Inadmissible Character Evidence

Defendant argues the trial court committed plain error by permitting the State to elicit testimony regarding Defendant's prior incarceration. He asserts this purported error constitutes impermissible character evidence. Defendant concedes he did not preserve this argument. He seeks plain error review. *See* N.C. R. App. P. 10(a)(4) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.").

### A. Standard of Review

Our Supreme Court has held plain error:

> is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings[.]

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citations, internal

quotation marks, and brackets omitted).

"Unpreserved error in criminal cases . . . is reviewed only for plain error." *State v. Lawrence*, 365 N.C. 506, 512, 723 S.E.2d 326, 330 (2012) (citations omitted). For a defendant to prove plain error, he must show a fundamental error occurred and establish prejudice. *See Id.* at 518, 723 S.E.2d at 334.

Defendant bears the burden of showing the unpreserved error "rises to the level of plain error." *Id.* at 516, 723 S.E.2d at 333. Defendant must also show he suffered prejudice, by "the error ha[ving] a probable impact on the jury's finding that the defendant was guilty." *Id.* (citations and quotation marks omitted).

### B. Rule 404(b)

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such a proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2023).

The Supreme Court of North Carolina has repeatedly interpreted Rule 404(b) to be a rule of inclusion, and not exclusion. *State v. Beckelheimer*, 366 N.C. 127, 131, 726 S.E.2d 156, 159 (2012). This inclusion of Rule 404(b) testimony or evidence is constrained by the requirements of similarity and temporal proximity of the evidence to the alleged acts. *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 123

(2002).

Admission of evidence under Rule 404(b) is "subject to but *one exception* requiring the exclusion of evidence if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Lyons*, 340 N.C. 646, 668, 459 S.E.2d 770, 782 (1995) (citation omitted).

Our Supreme Court has also held "[t]he list of permissible purposes for admission of 'other crimes' evidence is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." *State v. Hipps*, 348 N.C. 377, 404, 501 S.E.2d 625, 641 (1998) (citations omitted).

In *State v. Hobson*, this Court held testimony of defendant's former girlfriend concerning her relationship with defendant, including an alleged past assault, was relevant to show the victim was in reasonable fear of defendant, in a prosecution for misdemeanor stalking. *State v. Hobson*, 261 N.C. App. 60, 63, 819 S.E.2d 397, 400 (2018). The defendant's former girlfriend testified to sending a text message to the victim about the assault and warning the victim to be careful, and stating the former girlfriend herself was afraid of defendant. *Id.*

## C. Analysis

Nevel testified Defendant had previously been incarcerated for assaulting her. Defendant asserts this testimony constituted improper character evidence. The

context of her testimony shows otherwise. The State's questions were directed at explaining Nevel's state of mind and apprehension while testifying, rather than to establish Defendant's violent disposition. As this Court recognized in *Hobson*, testimony regarding prior assaults may be admitted to show a witness's fear of the defendant in the context of trial testimony. *Id.*

In *State v. Burke*, our Supreme Court upheld the admission of testimony about a witness's fear of the defendant as relevant to the jury's assessment of credibility. *State v. Burke*, 343 N.C. 129, 152, 469 S.E. 2d 901, 912 (1996). Here, Nevel's testimony falls within these permissible purposes under Rule 404(b).

Defendant has not demonstrated error, much less plain error. Presuming, without deciding, the admission of this testimony was improper, Defendant cannot show Nevel's testimony constituted prejudicial error. *See* N.C. Gen. Stat. § 15A-1443(a) (2023). The State presented substantial evidence of Defendant's guilt, including eyewitness testimony, physical evidence, and the medical examiner's findings. Defendant has not demonstrated, absent Nevel's testimony on the prior assault, the jury would have reached a different result. Defendant's argument is overruled.

## VI.    Conclusion

Defendant failed to preserve his challenge to the denial of his request for first and last closing arguments after providing evidence. Defendant has failed to demonstrate plain error in the admission of testimony about his prior incarceration.

Presuming, without deciding, the testimony was improper, Defendant cannot show prejudicial error. *See* N.C. Gen. Stat. § 15A-1443(a) (2023).

Defendant received a fair trial free from prejudicial errors he preserved and argued. We discern no error in the jury's verdict or in the judgment entered thereon. *It is so ordered.*

NO ERROR.

Judges CARPENTER and STADING concur.

Report per Rule 30(e).